UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PHYSICIANS HEALTHSOURCE,
    Plaintiff,

v.

BOEHRINGER INGELHEIM
PHARMACEUTICALS, et al.,
    Defendants.

No. 3:14-cv-00405 (SRU)

## MEMORANDUM OF DECISION

Physicians Healthsource sued Boehringer Ingelheim Pharmaceuticals, Boehringer Ingelheim Corp. (collectively, "Boehringer"), Medica, Inc., and John Does 1–10 for violation of the Telephone Consumer Protection Act of 1991 ("TCPA"), as amended by the Junk Fax Prevention Act of 2005, 47 U.S.C. § 227. Physicians Healthsource is a medical clinic based in Cincinnati, Ohio; it alleges that a fax sent to one of its doctors by the defendants was an "unsolicited advertisement" that violated the TCPA. The defendants have moved for summary judgment, arguing that under the undisputed facts, the fax was not an "advertisement" as a matter of law. For the reasons that follow, I grant the motions for summary judgment.

### I. Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a summary judgment motion, the court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000); *Aldrich v. Randolph Ctrl. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all

inferences in favor of the nonmoving party"). "The burden of showing that no genuine factual dispute exists rests upon the moving party." *Carlton v. Mystic Transp.*, 202 F.3d 129, 133 (2d Cir. 2000). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but must present sufficient evidence supporting its position "to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"The trial court's function at this stage is to identify issues to be tried, not decide them," *Graham v. Long Island R.R. Co.*, 230 F.3d 34, 38 (2d Cir. 2000), and so "[o]nly when no reasonable trier of fact could find in favor of the non-moving party should summary judgment be granted." *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000). Summary judgment therefore is improper "[w]hen reasonable persons, applying the proper legal standards, could differ . . . on the basis of the evidence presented." *Sologub*, 202 F.3d at 178. Nevertheless,

> the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

*Anderson*, 477 U.S. at 247–48.

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and in such circumstances, there is "no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim). To present a "genuine" issue of material fact and avoid

summary judgment, the record must contain contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

**II.    Background**[1]

On April 6, 2010, Dr. Jose Martinez—a general practitioner employed by Physicians Healthsource in Cincinnati, Ohio—received a fax from defendant Medica. The fax invited Dr. Martinez to an "awareness dinner meeting" on April 28, 2010 at a McCormick & Schmick's restaurant in Cincinnati, sponsored by defendant Boehringer and featuring a presentation by board-certified obstetrician/gynecologist David Portman. The pertinent text reads as follows:

> Boehringer Ingelheim Pharmaceuticals, Inc. cordially invites you to join us for a dinner meeting entitled, *It's Time to Talk: Recognizing Female Sexual Dysfunction and Diagnosing Hypoactive Sexual Desire Disorder.* Based on recent data from a large US study (PRESIDE), 43% of US women aged > 18 years have experienced a sexual problem in their lives and 9.5% of the same group of women have experienced decreased sexual desire with distress. This program has been developed to discuss Female Sexual Dysfunction (FSD), including Hypoactive Sexual Desire Disorder (HSDD) including pathophysiology models, epidemiology, and diagnosis. We hope you will join us for this informative and stimulating program.

Fax, Ex. A to Compl., Doc. No. 1, at 15. The remainder of the fax concerns logistics, such as the time, date, and location of the dinner meaning, and the process of registration.

Around the time of the dinner meeting, Boehringer was seeking approval from the Food and Drug Administration ("FDA") for a new drug, flibanserin. Flibanserin was intended as a treatment for FSD/HSDD.[2] The fax sent to Dr. Martinez does not name any product designed to

---

[1] Except where otherwise indicated, the background information is taken from undisputed facts in the parties' Local Rule 56(a)1 & 56(a)2 Statements.

[2] FSD and HSDD were combined into a new diagnosis of female sexual interest/arousal disorder ("FSIAD") by the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders in 2013. *See* Walid F. Gellad, Kathryn E. Flynn, and G. Caleb Alexander, *Evaluation of Flibanserin: Science and Advocacy at the FDA*, 314 J. Am. Med. Ass'n 869 (2015), https://jamanetwork.com/journals/jama/article-abstract/2389384. FSD/HSDD and FSIAD are

3

treat FSD/HSDD, however—in fact, it does not mention treatment of the disorders at all. On June 18, 2010, an FDA advisory panel recommended against approving flibanserin, and Boehringer halted development of the drug. Boehringer subsequently sold its rights in flibanserin to Sprout Pharmaceuticals, which (following FDA approval) brought flibanserin to market under the trade name Addyi. Boehringer has never commercially produced flibanserin.

On March 30, 2014, Physicians Healthsource sued the defendants for violating the TCPA by faxing an "unsolicited advertisement" without a proper opt-out notice. Physicians Healthsource brought a putative class action on behalf of: "All persons who (1) on or after four years prior to the filing of this action, (2) were sent telephone facsimile messages of material advertising the commercial availability of any property, goods, or services by or on behalf of Defendants, and (3) did not display a proper opt-out notice." Compl., Doc. No. 1, at 4.

Medica and Boehringer moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on May 21, 2014, and May 22, 2014, respectively. Docs. Nos. 19 & 22. The defendants argued that Physicians Healthsource failed to state a claim because the fax was not an "advertisement" as defined by the TCPA. On January 12, 2015, I granted the motions to dismiss, reasoning that "[n]othing in the [f]ax indicates that the dinner was a pretext for pitching a Boehringer product or service related to FSD/HSDD or links the potential registrant with Boehringer's other products and services." *Physicians Healthsource v. Boehringer Ingelheim Pharm.*, 2015 WL 144728, at *5 (D. Conn. Jan. 12, 2015), *vacated and remanded*, 847 F.3d 92 (2d Cir. 2017). Physicians Healthsource appealed, and the Second Circuit vacated and remanded.

---

controversial diagnoses, and some observers have accused pharmaceutical companies of "attempting to treat something that isn't a disease." Emily Nagoski, *Nothing Is Wrong with Your Sex Drive*, N.Y. Times, Feb. 27, 2015, https://www.nytimes.com/2015/02/27/opinion/nothing-is-wrong-with-your-sex-drive.html.

The Second Circuit "agree[d] that a fax must have a commercial purpose"—"i.e., 'that the defendant advertised, or planned to advertise, its products or services at the seminar'"—"to be an 'unsolicited advertisement.'" *Physicians Healthsource*, 847 F.3d at 93, 95 (quoting *Physicians Healthsource*, 2015 WL 144728, at *3). "[A]t the pleading stage," however, "where it is alleged that a firm sent an unsolicited fax promoting a free seminar discussing a subject that relates to the firm's products or services," the Court of Appeals deemed it "plausible . . . that the fax had the commercial purpose of promoting those products or services." *Id.* at 95. Here, "Boehringer's fax advertised a 'dinner meeting' to discuss two medical conditions" that, "[a]s a pharmaceutical company, Boehringer was generally in the business of treating." *Id.* at 97. The Second Circuit held that, for purposes of a Rule 12(b)(6) motion, those facts sufficiently "alleged that Boehringer's fax advertised a free seminar relating to its business." *Id.*

The Second Circuit also stated that, "after discovery," Boehringer could "rebut [the] inference [of a commercial purpose] by showing that it did not or would not advertise its products or services at the seminar." *Id.* at 95. Boehringer could present "[i]n defense, . . . *inter alia*, testimony of the dinner meeting participants[,] . . . the meeting's agenda [and] transcript, presentation slides, speaker list, or any internal emails or correspondences discussing the meeting." *Id.* at 97. The Court thus remanded for discovery and further proceedings.

On March 9, 2017, this court received the Court of Appeals' mandate and reopened the case. On August 30, 2017, I held a Rule 16 pretrial conference with the parties, at which I determined to "resolve the defendants' proposed motion[s] for summary judgment against Physicians Healthsource's individual claim prior to a motion for class certification." Conf. Mem. & Order, Doc. No. 69, at 1. I directed the parties to begin discovery, "[a]ppropriate subjects" of

5

which might include "emails, agreements, and other materials relating to the April 2010 meeting in Cincinnati that is the basis for Physicians Healthsource's [individual] claim." *Id.*

At the Rule 16 pretrial conference, I also scheduled a hearing on the defendants' anticipated motions for summary judgment for March 27, 2018. Medica and Boehringer separately moved for summary judgment on February 9, 2018. Docs. Nos. 81 & 73. Physicians Healthsource filed a combined opposition on March 7, 2018. Doc. No. 85.

**III.   Discussion**

In order to prevail on its TCPA claim, Physicians Healthsource must show that the defendants sent Physicians Healthsource an "unsolicited advertisement." *Physicians Healthsource*, 847 F.3d at 94 (quoting 47 U.S.C. § 227(b)(1)(C)). The statute defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." *Id.* at 95 (quoting 47 U.S.C. § 227(a)(5)). That definition has been further refined by the Federal Communications Commission ("FCC"). *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005*, 71 Fed. Reg. 25,967 (May 3, 2006) (the "2006 Rule"). The FCC's 2006 Rule notes that even "facsimile messages that promote goods or services even at no cost, such as . . . free consultations or seminars," may constitute "unsolicited advertisements," because "[i]n many instances, 'free' seminars serve as a pretext to advertise commercial products and services." *Id.* at 25,973.

"[N]ot every unsolicited fax promoting a free seminar satisfies the Rule," however. *Physicians Healthsource*, 847 F.3d at 96. Instead, "[t]here must be a commercial nexus to a firm's business, i.e., its property, products, or services." *Id.* Whether a free seminar actually was

6

"used to advertise a defendant's products or services" in a particular instance "is highly fact specific." *Id.*; *Physicians Healthsource v. Vertex Pharm.*, 247 F. Supp. 3d 138, 151 (D. Mass. 2017) ("*Vertex*"). If, prior to trial, a defendant introduces undisputed "evidence showing that it did not feature its products or services at the seminar," then that defendant is entitled to summary judgment on a TCPA claim. *See Physicians Healthsource*, 847 F.3d at 97.

In the present case, the defendants assert that the fax "does not promote the commercial availability or quality of any Boehringer product or service," and that "the undisputed evidence shows that . . . Boehringer did not use the meeting to promote any products or services."[3] Boehringer's Mot. Summ. J., Doc. No. 83, at 1–2. Therefore, they contend, "there is no genuine issue that the [f]ax does not constitute an 'advertisement' within the meaning of the TCPA," and the defendants are "entitled to judgment as a matter of law." *Id.* at 2; *accord* Medica's Mot. Summ. J., Doc. No. 81, at 1 ("[T]here is no genuine issue that the . . . facsimile transmission at issue was not a pretext to advertise any property, goods, or services, and therefore does not violate the [TCPA] . . . ."). Physicians Healthsource responds that "[t]here is at least a genuine issue of material fact" with respect to whether the fax constitutes an "advertisement" as a result of the "'commercial nexus' between the free seminars announced by the [f]ax and [f]libanserin, the product designed to address the medical condition discussed at the seminar." Mem. Opp'n Mots. Summ. J., Doc. No. 85, at 5–6. According to Physicians Healthsource, because the fax and the dinner meeting were intended to "indirectly advertise [f]libanserin," the defendants cannot establish their entitlement to judgment as a matter of law. *Id.*

---

[3] The defendants also dispute that the fax was "unsolicited," but do not seek summary judgment on that basis. *See* Mem. Supp. Medica's Mot. Summ. J., Doc. No. 81-1, at 9 n.3; Mem. Supp. Boehringer's Mot. Summ. J., Doc. No. 83-1, at 18 n.9.

Both parties appear to accept that the "evidence show[s] [Boehringer] did not feature its products or services at the seminar." *See Physicians Healthsource*, 847 F.3d at 96. The speaker at the dinner meeting, Dr. Portman, testified that he "w[as] not permitted to mention [f]libanserin during the program" because the drug had not yet been approved by the FDA. Portman Dep., Ex. B to Medica's Mot. Summ. J., Doc. No. 81-2, at 23. Furthermore, the slide presentation displayed at the dinner meeting "d[id] not mention [f]libanserin or any other Boehringer product," and "d[id] not include any discussion of treatment options for FSD or HSDD." Charles Aff., Ex. A to Boehringer's Local Rule 56(a)1 Statement, Doc. No. 84-1, at 6; *see generally* Slide Presentation, Ex. E to Boehringer's Local Rule 56(a)1 Statement, Doc. No. 84-5, at 1–40. Boehringer's name and logo only appear on two slides out of forty: one slide simply announces that "Boehringer . . . has provided financial support for this program," and the other features a copyright notice. *See* Slide Presentation, Doc. No. 84-5, at 4, 39. No one from Physicians Healthsource attended the dinner meeting or saw any of the presentation materials, *see* Garrigan Dep., Ex. D to Medica's Mot. Summ. J., Doc. No. 81-2, at 66, and Physicians Healthsource offers no evidence that Boehringer actually promoted flibanserin at the seminar.

I also note that Boehringer could not have advertised flibanserin at the dinner meeting without running afoul of FDA regulations. First, the seminar was designed to comply with FDA guidance regarding "disease awareness communications." Charles Aff., Doc. No. 84-1, at 5. Under an FDA guidance then in effect,[4] "manufacturer[s], distributor[s], or retailer[s] of a drug or device" were permitted to issue communications that "discuss[ed] a disease or health condition," "encourage[d] awareness of signs of the particular disease," "d[id] not mention a

---

[4] The guidance in question was withdrawn in May 2015 as part of an effort to "improve the efficiency and transparency of the guidance development process." *Withdrawal of Draft Guidance Documents Published Before December 31, 2013*, 80 Fed. Reg. 26,059 (May 6, 2015).

particular drug," and "d[id] not include any representation or suggestion relating to a particular drug." *See* FDA, *Draft Guidance for Industry: "Help-Seeking" and Other Disease Awareness Communications by or on Behalf of Drug and Device Firms*, Ex. D to Boehringer's Local Rule 56(a)1 Statement, Doc. No. 84-4, at 7. The FDA stated that such "communication[s] constitute[d] neither labeling nor advertising" so long as they did not—directly or "by implication"—"mention[] a specific drug or device or contain[] a representation or suggestion concerning a specific drug or device." *Id.* at 7, 9. Second, at the time, Boehringer was not allowed to promote flibanserin at all because the drug was not "approved for commercial distribution." 21 C.F.R. § 312.7. Although the Second Circuit indicated that the "prohibition [was] not necessarily inconsistent with the free dinner's mentioning the possible future availability of the drug," *Physicians Healthsource*, 847 F.3d at 97, the uncontested evidence shows that no such mention was made. Indeed, Dr. Portman testified that because the "FDA is a conservative regulatory body," he regarded it as "[v]ery important" not to "go off script," and carefully "follow[ed] th[e] [agency's] guidelines." Portman Dep., Doc. No. 81-2, at 23.

It is an undisputed fact that Boehringer did not advertise its products at the seminar. For an illustrative comparison, consider *Physicians Healthsource v. Vertex Pharmaceuticals*, in which a pharmaceutical company faxed invitations to a broadcast designed to "make practitioners aware of the indications, contraindications, dosing and side effects associated with Incivek," its new hepatitis C drug. *Id.* at 144. The faxes "contained the Vertex and Incivek logos" and displayed the name of the broadcast, "INCIVEK: A Change in the Treatment Paradigm." *Id.* at 145. The broadcast itself "consisted of a presentation of the FDA-approved package insert information about Incivek," which featured slides covering such topics as (a) "Indications and contraindications for Incivek," (b) "Use of 'response-guided therapy' . . . to administer Incivek,"

9

(c) "Dosage requirements and 'treatment futility rules' indicating when treatment with Incivek should cease," d) "Potential side effects and their management," (e) "Known and potentially significant drug interactions," and (f) "Warnings, precautions and safety information." *Id.* at 146. "Each slide . . . contained the trademarked word INCIVEK." *Id.* Based on those facts, the United States District Court for the District of Massachusetts held that "neither party [was] entitled to summary judgment" because "[a] reasonable fact-finder . . . could conclude that the [defendant]'s faxes . . . promote[d] the quality and availability of Incivek" and that "Vertex intended the seminar to promote the commercial availability of Incivek and to encourage physicians to prescribe it."[5] *Id.* at 151.

In the present case, there is far less evidence that Boehringer intended to promote flibanserin than there was that Vertex intended to promote Incivek. In *Vertex*, the fax displayed Incivek's logo and advertised a presentation entitled "INCIVEK: A Change in the Treatment Paradigm." *Id.* at 145. Here, the fax and the title of the presentation did not mention flibanserin at all.[6] *See* Fax, Doc. No. 1, at 15. Moreover, in *Vertex*, the entire purpose of the presentation was to provide "information *about Incivek*," *Vertex*, 247 F. Supp. 3d at 146 (emphasis added);

---

[5] In denying the plaintiff's motion for summary judgment, the court reasoned that "[t]he faxes d[id] not say anything about the quality or commercial availability of Incivek; d[id] not say that [Incivek was] available for sale; where or how it c[ould] be purchased, or what Incivek [was] or actually d[id]." *Physicians Healthsource v. Vertex Pharm.*, 247 F. Supp. 3d 138, 151 (D. Mass. 2017). The court held that "a reasonable fact-finder, drawing all inferences in favor of defendants, could conclude that the faxes" were not "advertisements" but "concerned an educational program presenting important clinical and patient safety information." *Id.*

[6] The fax does display Boehringer's logo, but as I noted in my ruling on the defendants' motions to dismiss, the TCPA expressly "requires [that] the sender's name appear on the fax," and the mere "appearance of a defendant's logo, without more[,] does not transform an informational message [in]to an advertisement." *Physicians Healthsource v. Boehringer Ingelheim Pharm.*, 2015 WL 144728, at *3 n.3 (D. Conn. Jan. 12, 2015) (citing 47 U.S.C. § 227(d)(1)(B); *Physicians Healthsource v. Janssen Pharm.*, 2013 WL 486207, at *5 (D.N.J. Feb. 6, 2013)).

almost all of the topics discussed concerned the use and effects of the drug, and the "trademarked word INCIVEK" appeared on every slide. *Id.* Here, however, it is undisputed that Dr. Portman never mentioned flibanserin, and that the drug's name never appeared in his presentation. In accordance with FDA regulations and Boehringer's own policies, Dr. Portman only "discuss[ed] the condition [of FSD/HSDD] and not treatments." Portman Dep., Doc. No. 81-2, at 22. Thus, because Boehringer has provided "evidence showing that it did not feature its products or services at the seminar," it has "rebut[ted]" the inference that "the fax had the commercial purpose of promoting . . . products or services." *Physicians Healthsource*, 847 F.3d at 95, 97.

Physicians Healthsource appears to concede that Boehringer "trained its dinner speakers . . . not to use the word '[f]libanserin' during the[] pre-FDA approval seminars." Mem. Opp'n Mots. Summ. J., Doc. No. 85, at 6. It argues, however, that the dinner meeting was part of "a robust marketing campaign to create demand for [f]libanserin, which took the form of 'disease state promotion awareness.'" *Id.* at 18. Boehringer's efforts to promote "disease state education," Physicians Healthsource argues, really constituted "an effort to teach doctors . . . about the prevalence of HSDD" and "to talk to patients about HSDD," in the hope that—following the expected FDA approval of the drug—those doctors "would . . . prescribe [f]libanserin to treat HSDD" and "generat[e] profit" for Boehringer. *Id.* at 19. In support of its position, Physicians Healthsource cites Boehringer training materials that "refer[] to disease state awareness 'promotional presentations'" and feature "address[es] from the 'flibanserin marketing and field force leadership team.'" *Id.* at 18–19. Physicians Healthsource also points to a workshop outline that describes "disease state selling [as] different from product-based selling because [disease state educators] are selling not a product, but an idea." *See* Boehringer Workshop Outline, Ex. 7 to Mem. Opp'n Mot. Summ. J., Doc. No. 85-8, at 3.

Boehringer responds that Physicians Healthsource's "repeated allegations that the dinner meeting was 'promotional' are both misleading and irrelevant." Boehringer's Reply Mem. Supp. Mot. Summ. J., Doc. No. 89, at 11. The accusations are "misleading" because Physicians Healthsource "misconstrues snippets from training materials to suggest that disease state education was equivalent to product advertising," when in fact "Boehringer's training materials . . . make clear that disease state education is distinct from sales for commercial products." *Id.* Physicians Healthsource's claims also are "irrelevant" because "even if one were to characterize Boehringer's overall program to seek FDA approval of [f]libanserin . . . as 'promotional,' that says nothing about whether Boehringer used the dinner meeting to promote [f]libanserin." *Id.* Boehringer concludes that the remote possibility that the "free seminar . . . might result in financial gain" does not mean that the faxed invitation violated the TCPA. *See id.* at 8.

Both sides cite *Sandusky Wellness Center v. Medco Health Solutions*, 788 F.3d 218 (6th Cir. 2015) ("*Medco*"), in which the Sixth Circuit affirmed a grant of summary judgment for defendants. *See id.* at 225. In *Medco*, a pharmacy benefit manager maintained "a list of medicines (known as the 'formulary') that are available through a [particular] healthcare plan." *Id.* at 220. "In addition to sending the formulary to its clients, Medco sen[t] it to healthcare providers that prescribe[d] medications to its clients' members" so that "the healthcare providers w[ould] know which medications [were] covered by their patients' healthcare plans." *Id.* Medco faxed the formulary to one such healthcare provider, Sandusky Wellness Center. "Other than listing Medco's name and number, the fax did not promote Medco's services and did not solicit business from Sandusky." *Id.* It did not "contain[] pricing, ordering, or other sales information," nor did it "ask Sandusky, directly or indirectly, to consider purchasing Medco's services." *Id.* at 221. The Sixth Circuit held that because "no record evidence show[ed] that the faxes promote[d]

the drugs or services in a commercial sense"—they were "not sent with hopes to make a profit, directly or indirectly, from Sandusky"—the faxes were "not advertisements." *Id.* at 222.

In *Medco*, Sandusky argued (much like Physicians Healthsource does here) that "a jury might conclude that . . . [the faxes] must have been sent to promote [Medco's] products or services" simply because, "taken together, [the] faxes have a positive effect on Medco's business." *Id.* at 225. Citing my earlier ruling in this case, the Sixth Circuit "reject[ed] th[at] quasi substantial-effects test." *Id.* "The fact that the sender might gain an ancillary, remote, and hypothetical economic benefit later on," the court held, "does not convert a noncommercial, informational communication into a commercial solicitation." *Id.* "The possibility that future economic benefits will flow from a non-commercial fax, ancillary to the content of the fax, is legally irrelevant to determining whether the fax is an ad." *Id.* "[E]xtraneous and speculative down-the-stream evidence cannot convert non-ads into ads." *Id.*

Boehringer interprets *Medco* to stand for the general proposition that "the potential for economic benefit does not convert non-commercial messages into advertisements." Boehringer's Reply Mem. Supp. Mot. Summ. J., Doc. No. 89, at 11. Physicians Healthsource, conversely, emphasizes that the faxes in *Medco* "lack[ed] [ ] commercial aspects" at all.[7] *Medco*, 788 F.3d at 224. As the Sixth Circuit observed, Medco did not sell any drugs and "ha[d] no interest whatsoever in soliciting business from Sandusky." *Id.* at 222. Instead, "the faxes list[ed] the

---

[7] Physicians Healthsource also suggests that the Second Circuit implicitly rejected *Medco* because it was "well aware of th[e] decision in the first appeal in this case, and . . . did not even cite it as relevant authority." Mem. Opp'n Mots. Summ. J., Doc. No. 85, at 25. That seems a stretch, not least because Physicians Healthsource claimed before the Second Circuit that *Medco* supported its position that "a court should . . . look past the 'four corners' of a fax in determining whether it is an 'advertisement.'" *See* Fed. R. App. P. 28(j) Letter, Doc. No. 72, No. 15-288, at 1–2 (2d Cir. Sept. 14, 2015). At any rate, *Medco* was an appeal from a grant of summary judgment, not from an order of dismissal, and so the Second Circuit may simply have declined to rely on the decision due to the different procedural posture of the appeal in this case.

drugs in a purely informational, non-pecuniary sense: to inform Sandusky what drugs its patients might prefer, based on Medco's formulary—a paid service already rendered not to Sandusky but to Medco's clients." *Id.* At most, the court concluded, the faxes may have served as "good publicity" for Medco and, by improving clients' experiences at Sandusky, might have increased their satisfaction with Medco's services. *See id.* at 225. But in the absence of any "record evidence reliably show[ing] that there would be such a financial benefit from the[] faxes," the Sixth Circuit held that Medco's financial gain was too "ancillary, remote, and hypothetical" to transform the facially "informational communications" into "commercial solicitation[s]." *Id.*

Physicians Healthsource attempts to distinguish *Medco* on the basis that "by 'educating' doctors [with respect] to HSDD," Boehringer "hoped to have doctors prescribe [f]libanserin 'in the future,'" and so it "sent the [f]ax with the 'hopes to make a profit' . . . from [f]libanserin sales." Mem. Opp'n Mots. Summ. J., Doc. No. 85, at 26. Those profits were "not 'ancillary, remote, and hypothetical,'" according to Physicians Healthsource, but "direct," because Boehringer "would have been the manufacturer of [f]libanserin." *Id.* at 27. In fact, Boehringer acknowledges that it "sponsored the . . . dinner meetings because it was pursuing FDA approval of [f]libanserin," and hoped that "physicians would be better situated to diagnose HSDD and . . . prescribe [f]libanserin." Boehringer's Mem. Supp. Mot. Summ. J., Doc. No. 83-1, at 22. Thus, Physicians Healthsource argues that the fax was an advertisement because the dinner meeting—though not promoting flibanserin itself—was designed to increase diagnoses of the condition for which the drug was prescribed, and thereby "create . . . demand and [a] market for [f]libanserin." Mem. Opp'n Mots. Summ. J., Doc. No. 85, at 24.

Physicians Healthsource's interpretation of an "advertisement" sweeps far beyond the scope of the TCPA. The statute defines "advertisement" to mean "any material advertising the

14

commercial availability or quality of any property, goods, or services," 47 U.S.C. § 227(a)(5); that definition comports with the ordinary meaning of "advertising" as "[t]he action of drawing the public's attention to something to promote its sale." *Florence Endocrine Clinic v. Arriva Med.*, 858 F.3d 1362, 1366 (11th Cir. 2017) (quoting *Black's Law Dictionary* (8th ed. 2004)); *Medco*, 788 F.3d at 221 (quoting *Black's Law Dictionary* (10th ed. 2014)). Therefore, in order to fall within the TCPA's ban, the fax must have "draw[n] attention to the 'commercial availability or quality' of [Boehringer] products to promote their sale." *Arriva Med.*, 858 F.3d at 1367. On its face, the fax did not do so. And although the Second Circuit held that the fax gave rise to a "plausible . . . inference" that the dinner meeting "had the commercial purpose of promoting [Boehringer's] products or services"—because "[b]usinesses are always eager to promote their wares and usually do not fund presentations for no business purpose"—discovery has now revealed that that the dinner meeting did not, in fact, "draw attention to the 'commercial availability or quality' of [Boehringer] products." *See Physicians Healthsource*, 847 F.3d at 95. As a result, the defendants have "rebut[ted] [the] inference" afforded to Physicians Healthsource at the motion to dismiss stage, *id.*, and it is clear that the fax "d[id] not promote the sale of [Boehringer] goods" and was "not [an] 'advertisement[]' within the meaning of the [TCPA]." *See Arriva Med.*, 858 F.3d at 1367.

In an attempt to resist that conclusion, Physicians Healthsource asserts that the fax and the dinner meeting "promoted" the condition of FSD/HSDD, but that cannot suffice. For one thing, Boehringer sells drugs, not diseases. More importantly, Physicians Healthsource's attenuated notion of "advertising" would go far beyond the TCPA and effectively ban *all* corporate public service announcements. A pharmaceutical company that sold anticoagulants could not send faxes promoting a charitable blood drive it sponsored, notwithstanding that none

15

of the company's products were mentioned. A women's health organization could not send faxes announcing a purely educational session on women's heart disease, so long as that session was paid for by a company that elsewhere marketed cardiovascular medication to women. And Physicians Healthsource's own law firm could not send faxes promoting an informational seminar on the TCPA for the local bar association, even if the firm did not in any way advertise its expertise in litigation under the statute. Physicians Healthsource's interpretation would force any faxes with a general business purpose—in the case of a for-profit entity, virtually all of them—into the prohibited category of advertising. Nothing in the TCPA suggests that Congress intended the statute's proscription to be so broad.[8]

To be sure, a handful of district courts have indicated that "a factfinder could infer the existence of an advertisement" from a fax that merely might "le[ad] primary physicians to . . . discuss [a condition] more frequently," which "in turn could stimulate demand for Defendants' products." *See Physicians Healthsource v. Stryker Sales Corp.*, 65 F. Supp. 3d 482, 491 (W.D. Mich. 2015). But under the facts of this case, the relationship between the fax and Boehringer's expected "economic benefit" is far too "ancillary, remote, and hypothetical." *See Medco*, 788 F.3d at 225. I have not found (and Physicians Healthsource has not cited) any case in which a court held that a fax was an "advertisement" solely because it invited recipients to an event that

---

[8] Physicians Healthsource's interpretation also would effectively bar companies from faxing "disease awareness communications," which—at the time that the fax in this case was sent—the FDA regarded as a way to "provide important health information to consumers and health care practitioners, and . . . encourage consumers to seek, and health care practitioners to provide, appropriate treatment." FDA, *Draft Guidance for Industry: "Help-Seeking" and Other Disease Awareness Communications by or on Behalf of Drug and Device Firms*, Ex. D to Boehringer's Local Rule 56(a)1 Statement, Doc. No. 84-4, at 5. The FDA stated that such communications were "particularly important for under-diagnosed, under-treated health conditions," *id.*, a category that Dr. Portman opined (and Physicians Healthsource does not dispute) includes HSDD and FSD. Portman Dep., Ex. B to Medica's Mot. Summ. J., Doc. No. 81-2, at 22.

16

discussed a medical condition for which the sender offered a potential treatment. In all the cases that have treated such faxes as "pretext[s] to advertise commercial products and services," *see Stryker Sales Corp.*, 65 F. Supp. 3d at 491, either the fax itself or the free event expressly promoted a commercially available product or treatment. *See, e.g.*, *Vertex*, 247 F. Supp. 3d at 146 (satellite broadcast on hepatitis C explicitly promoted defendant's drug as "a change in the treatment paradigm"); *Stryker Sales Corp.*, 65 F. Supp. 3d at 486–87 (meeting was designed to "raise awareness of orthopaedic treatment options offered by [defendant]" and included a slideshow that made "direct references to [defendant's] products" and encouraged attendees to "[c]all 1-888-STRYKER or visit www. aboutstryker.com"); *Physicians Healthsource v. Salix Pharm.*, 2015 WL 4713266, at *2 (E.D.N.C. Aug. 7, 2015) (fax inviting recipients to a "hands-on-workshop" for fecal incontinence prominently featured a banner that read, "For greater control over FECAL INCONTINENCE," accompanied by the logo of defendant's drug and "a link to a website for 'Complete Prescribing Information'"); *St. Louis Heart Ctr. v. Forest Pharms.*, 2013 WL 1076540, at *3 (E.D. Mo. Mar. 13, 2013) (fax inviting physician to a free "medical discussion regarding the treatment of hypertension" prominently displayed the "drug logo for Bystolic," defendant's hypertension drug, and included "'Important Safety Information' concerning Bystolic" and "[a] link to Bystolic's website . . . for 'full Prescribing Information'"). Here, conversely, it is undisputed that both the fax and the dinner meeting only "discuss[ed] the condition" of FSD/HSDD, "not treatments." Portman Dep., Doc. No. 81-2, at 22.

In short, Physicians Healthsource would interpret the TCPA as imposing a per se ban on faxed invitations to free seminars, a reading that the Second Circuit already rejected. *See Physicians Healthsource*, 847 F.3d at 96 (The TCPA and its implementing regulations "do[] not aim at faxes promoting free seminars *per se*."). Reasoning that "not every unsolicited fax

17

promoting a free seminar" violates the TCPA, the Second Circuit invited Boehringer to "rebut at the summary judgment stage with evidence showing that it did not feature its products or services at the seminar." *Id.* at 96–97. Boehringer has now done so. The undisputed evidence shows that the seminar did not "adverti[se] the commercial availability or quality of any property, goods, or services." *See* 47 U.S.C. § 227(a)(5). Therefore, the faxed invitation was not an "advertisement," and the defendants are entitled to judgment as a matter of law. *See id.*

## IV. Conclusion

For the foregoing reasons, I grant the motions for summary judgment, Docs. Nos. 81 & 83. The Clerk shall enter judgment in favor of the defendants and close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 18th day of April 2018.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge